UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

BOBBY JEHU STROUP,

                     Petitioner,

    v.

RENEE BAKER, *et al.*,

                   Respondents.

Case No. 3:12-cv-00414-MMD-VPC

ORDER

## I.    INTRODUCTION

This action is a petition for a writ of habeas corpus by Bobby Jehu Stroup, a Nevada prisoner serving four consecutive terms of life in prison without the possibility of parole, on two convictions of first degree murder with use of a deadly weapon. The case is before the Court with regard to the merits of the one claim in Stroup's habeas petition, a claim that his Sixth Amendment right to a speedy trial was violated. In this order, the Court denies Stroup's petition, denies him a certificate of appealability, and orders that judgment be entered accordingly.

## II.    BACKGROUND FACTS AND PROCEDURAL HISTORY

The following is from the Nevada Supreme Court's March 17, 2003, opinion on Stroup's direct appeal:

> The State presented the following theories to connect appellant Bobby Stroup (Bobby) with the homicides of Jack Strawbridge and Dan Rasmussen: (1) Bobby directly participated in the murders; (2) Bobby aided and abetted his son, Roger Stroup (Roger), by providing guns used in the killings, driving Roger to the scene of the crime, or by other means; and (3) Bobby conspired with Roger to commit the murders.

The State argued the killings were motivated by unpaid debts. In 1991, Roger loaned Rasmussen $30,000 to conduct drug deals. A smaller amount was loaned to Strawbridge. Rasmussen was to purchase narcotics, sell the drugs for a profit, and reimburse Roger the principle and a portion of profits. Instead, Rasmussen spent the money buying drugs and other items for his own personal consumption. In early October 1991, Roger began demanding repayment, but was continually rebuffed. The State claimed Roger's anger rose to a "boiling point" immediately prior to the murders. On the evening of October 11, 1991, Roger and Rasmussen engaged in a verbal confrontation which escalated into a physical altercation. Shortly thereafter, Roger drove to Rasmussen's residence where a second physical altercation ensued. After the fight broke up, Roger kept yelling, "You're dead. You're dead. You don't even know it." Following the incident, Roger made two phone calls. During the first call, he said, "I want daddy. They're coming guns at me." He kept saying he wanted his guns and would get them if they could not be brought to him. Next, Roger called his mother. She relayed the information to Bobby the next day.

On October 12, 1991, at approximately 2:30 a.m., Bobby arrived at Roger's house and said, "Let's go." Although Roger appeared apprehensive and nervous, Bobby was calm and in control.

On October 13, 1991, Rasmussen drove to a 7-Eleven store on his motorcycle. After he parked, a car pulled up and blocked him from exiting. Roger got out of the vehicle, grabbed Rasmussen's arm, placed him inside the vehicle, and drove away at high speed. Five people were in the car, one of whom was Strawbridge. The State presented circumstantial evidence and eyewitness testimony that Bobby was one of the other two persons present. Late that evening, the bodies of Rasmussen and Strawbridge were found riddled with bullets in a turnout on Mt. Rose Highway. Motorcycles belonging to both victims were later recovered at the 7-Eleven store parking lot.

Darby Wheeler (Wheeler), a special agent with the Bureau of Alcohol, Tobacco and Firearms, traced two .380 firearms with the serial numbers 56885 and 56886. Firearm 56885 was found at the scene of the crime and firearm 56886 was located at the home of James Oxley (Oxley). Both firearms were purchased by Michael Kirby (Kirby) and resold to Oxley. Oxley testified he kept one and gave the other to Bobby.

Oxley testified that in October 1991, Bobby asked him to report the guns stolen so they could get rid of them. Shortly thereafter, Bobby had Oxley drive him to Mt. Rose Highway and said they needed to look for a gun on the roadside. When they approached the crime scene, Bobby became jumpy and told Oxley to go back.

Dave Sloan (Sloan) testified Roger arrived home the night of October 13, 1991, or the early morning of October 14, 1991. Roger took his sweats off and asked Sloan to burn them. Then Roger said, "Never mind. I don't want to involve you with it. I'm not supposed to be even talking to you. So if anybody asks, you haven't seen me. If anybody asks where I'm at, I'm away on business with my dad." Roger said Strawbridge, Rasmussen and Al Opra were all dead. Roger told Sloan that if he talked to anybody he would be killed also. Sloan received a

phone call from Roger two days later. Roger asked Sloan whether he talked to the police. At the end of the call, Roger said, "See, Dad, I told you he wouldn't roll over on us." Roger told Sloan he did a good job, to stay quiet, and not do anything or he would be killed also.

On October 15, 1991, a burned vehicle was found in Toiyabe National Forest. The car was registered to Tina Andrews (Tina). Tina was married to Jerry Andrews, Bobby's long-time friend. A portion of the car's tire was consistent with tread impressions found at the crime scene. A knife found in the car fit into the knife sheath found on Strawbridge's belt. A metallurgist compared metal parts and a snap belonging to a helmet, also found in the car, with the helmet of Lori Rasmussen (Lori). They were fabricated using the same machine. Lori, Rasmussen's wife, purchased identical helmets for herself and Rasmussen prior to his demise.

Furthermore, blood stains matching Rasmussen's and Roger's blood type were found on a pair of jeans recovered from Roger's house. The jeans contained a greater amount of Rasmussen's blood.

In March 2000, Leland Nicholson (Nicholson) befriended Bobby while incarcerated at the Washoe County Jail. Nicholson testified that Bobby gave a graphic description of the murders and implicated himself. Nicholson's testimony included statements not known to the general public. However, Nicholson also made some statements contrary to the evidence. In exchange for Nicholson's testimony, the prosecutor agreed to send a letter to the parole board regarding Nicholson's cooperation. Bobby testified he did not tell Nicholson that he was involved with the murders, but merely told him about what was going on with the case.

Brent Muir (Muir) was also incarcerated with Bobby at Washoe County Jail. He testified to statements Bobby made regarding the murders. Muir was also aware of facts not available through the media and made some statements contrary to the evidence. Karla Butko, Muir's attorney, said she told Muir they would argue for a sentencing departure in his federal case, but there was not a lot of hope.

On August 17, 1998, a criminal complaint was filed against Bobby. At the time, he was in California facing homicide charges on an unrelated matter. In October 1999, Bobby was extradited to Nevada.

The jury found Bobby guilty of two counts of first degree murder with the use of a deadly weapon. During the penalty hearing, jurors imposed four consecutive life sentences without the possibility of parole.

(Order of Affirmance, Exhibit 302, pp. 1-4.)[1]

///

---

[1]In this order, unless otherwise noted, the exhibits referred to by the Court are those filed by respondents with their answer, and located in the record at dkt. nos. 13-29.

The Nevada Supreme Court affirmed Stroup's conviction and sentences on March 17, 2003. *Id.*

Stroup filed a state-court habeas corpus petition on March 30, 2004. (Exhs. 305A, 305B, 305C, 305D.) The state district court held an evidentiary hearing on December 2 and 3, 2009. (Exhs. 387A, 387B, 387C, 387D, 388A, 388B, 388C.) The petition was denied on August 17, 2011. (Exh. 404.) Stroup appealed. (Exh. 405.) On May 9, 2012, the Nevada Supreme Court affirmed the judgment of the state district court. (Exh. 414.)

Stroup initiated this federal habeas corpus action, *pro se*, on August 6, 2012. *See* Petition for Writ of Habeas Corpus (dkt. no. 7) (received August 6, 2012). Respondents[2] filed an answer on January 17, 2013 (dkt. no. 12). Stroup filed a reply on July 11, 2013 (dkt. no. 40).

**III.    STANDARD OF REVIEW**

Because this action was initiated after April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and Effective Death Penalty Act (AEDPA) apply. See *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir.2000), overruled on other grounds by *Lockyer v. Andrade*, 538 U.S. 63 (2003). Section 2254(d) sets forth the primary standard of review under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

---

[2]The respondents are the warden of Ely State Prison, where Stroup is incarcerated, and the Attorney General of the State of Nevada. Stroup's habeas petition names Catherine Cortez Masto as the respondent Attorney General of the State of Nevada. However, Adam Paul Laxalt now holds that office. Therefore, pursuant to Federal Rule of Civil Procedure 25(d), Adam Paul Laxalt is automatically substituted for Catherine Cortez Masto as the respondent Attorney General of the State of Nevada. The Court will direct the Clerk of the Court to update the docket in this regard.

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Lockyer*, 538 U.S. at 73 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)) (internal quotation marks omitted).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Lockyer*, 538 U.S. at 75 (quoting *Williams*, 529 U.S. at 413) (internal quotation marks omitted). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (citing *Williams*, 529 U.S. at 409).

The Supreme Court has further instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 786 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court stated that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, __ U.S. __, 131 S.Ct. 1388, 1398 (2011) (AEDPA standard is "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

The state court's "last reasoned decision" is the ruling subject to section 2254(d) review. *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir.2010). If the last reasoned state-court decision adopts or substantially incorporates the reasoning from a previous state-court decision, a federal habeas court may consider both decisions to ascertain the state court's reasoning. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir.2007) (en banc).

If the state supreme court denies a claim but provides no explanation for its ruling, the federal court still affords the ruling the deference mandated by section 2254(d); in such a case, the petitioner is entitled to habeas relief only if "there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S.Ct. at 784.

The analysis under section 2254(d) looks to the law that was clearly established by United States Supreme Court precedent at the time of the state court's decision. *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). Additionally, in considering the petitioner's claims under section 2254(d), the federal court takes into account only the evidence presented in state court. *Pinholster*, 131 S.Ct. at 1400-01.

If the petitioner meets the standard imposed by section 2254(d), the federal court may then allow factual development, possibly including an evidentiary hearing, and the federal court's review, at that point, is *de novo*. *See Panetti v. Quarterman*, 551 U.S. 930, 948 (2007); *Wiggins*, 539 U.S. at 528-29; *Runningeagle v. Ryan*, 686 F.3d 758, 785-88 (9th Cir.2012).

## IV.    ANALYSIS

Stroup claims that his conviction and sentence are unconstitutional, in violation of his Sixth Amendment right to a speedy trial. *See* Petition for Writ of Habeas Corpus (dkt. no. 7 at 3), citing *Barker v. Wingo*, 407 U.S. 514 (1972).

Although the right to a speedy trial is "one of the most basic rights preserved by our Constitution," *Klopfer v. North Carolina*, 386 U.S. 213, 226 (1967), there is no fixed measure to determine when the right has been violated. Rather, courts apply a somewhat flexible "functional approach," weighing the various interests at stake. *Barker*,

1    407 U.S. at 522. The primary factors to be considered are the length of the delay, the

2    reasons for the delay, the degree to which the defendant asserted the right to a speedy

3    trial, and the extent of prejudice to the defendant caused by the delay. *Id.* at 530-33.

4         The Nevada Supreme Court ruled on Stroup's speedy trial claim, on his direct

5    appeal, as follows:

6              … Bobby asserts his speedy trial rights were violated because his
      trial was delayed by eight years and seven months and he was allowed to
7      stand trial in California before being extradited to Nevada. Bobby also
      argues that if he had been prosecuted in Nevada first, instead of
8      California, he would never have met or spoken to Nicholson and Muir. We
      disagree.

9
              *Barker v. Wingo* [407 U.S. 514, 530 (1972)] provides criteria to
10     weigh the validity of a Sixth Amendment speedy trial right claim.
      Considerations include the length of delay, reason for delay, defendant's
11     assertion of his right, and prejudice to the defendant. [*Barker v. Wingo*,
      407 U.S. at 530.] Unless the delay is long enough to be presumptively
12     prejudicial, inquiry into the other factors is not necessary. [*Id.*] A one-year
      delay satisfies the threshold requirement of *Barker*, so further inquiry is
13     required.

14             "[D]ifferent weights should be assigned to different reasons" for
      delay. [*Id.* at 531.] Valid reasons for postponing a trial are weighted in
15     favor of the government. [*Id.*] However, a valid reason does not
      necessarily mean a defendant's right to a speedy trial has not been
16     violated. This is merely one factor to be considered in the balancing test.
      [*Id.* at 533.] The district court found the vast majority of delay was caused
17     by Bobby's refusal to waive extradition, his request for time to consider
      whether to challenge the warrant, and the criminal charges brought
18     against him in California. "When a defendant violates the laws of several
      different sovereigns ... at least one sovereign, and perhaps more, will have
19     to wait its turn at the prosecutorial turnstile." [*U.S. v. Grimmond*, 137 F.3d
      823, 828 (4th Cir.1998).] California and Nevada both have extradition
20     statutes allowing government officials to reach an agreement regarding
      who will prosecute a defendant first. [NRS 179.187, 179.215; Cal. Penal
21     1553.1, 1551.3.] While out on bail for a homicide in California, Bobby was
      arrested on an extradition warrant for the homicides committed in Nevada.
22     Bobby stood trial in California first and was immediately remanded to
      Nevada for trial.
23
              Bobby provided minimal support for his speedy trial argument. At a
24     hearing on a pretrial writ, Bobby presented the testimony of William
      Osterhoudt, the attorney who represented him in California. No other
25     evidence was presented. The hearing had been delayed by several
      months to allow Bobby's counsel to get subpoenas and have the
26     California prosecutor testify regarding conversations he had with Nevada
      authorities. Bobby, however, failed to have the prosecutor testify at the
27     hearing.

28   ///

7

1

2          Lastly, Bobby has not demonstrated he was prejudiced by the
    delay. He cites to *Doggett v. United States*, where the United States
3   Supreme Court stated that "affirmative proof of particularized prejudice is
    not essential to every speedy trial claim." [505 U.S. 647, 655 (1992) (citing
    *Moore v. Arizona*, 414 U.S. 25, 26 (1973)).] The Court further stated that
4   "such presumptive prejudice cannot alone carry a Sixth Amendment claim
    without regard to the other *Barker* criteria," but "its importance increases
5   with the length of delay." [*Doggett v. United States*, 505 U.S. at 656.] In
    *Doggett*, a delay of eight and a half years between the time the defendant
6   was indicted and brought to trial in combination with government
    negligence was held to violate the Sixth Amendment. [*Id.* at 657-58.] The
7   Sixth Amendment speedy trial provision is triggered by indictment, arrest
    or other official accusation [*Id.* at 655] and does not apply until the suspect
8   "in some way becomes an 'accused.'" [*United States v. Marion*, 404 U.S.
    307, 313 (1971).] Here, Bobby did not become an "accused" until a
9   criminal complaint was filed on August 17, 1998. Thus, the relevant time
    period began when charges were filed, not when the murders occurred in
10  1991. We conclude Bobby's Sixth Amendment speedy trial right has not
    been violated by post-indictment delay.

11  (Order of Affirmance, Exh. 302 at 13-15 (footnotes included in brackets).)

12      The Nevada Supreme Court properly applied the governing Supreme Court

13  precedent: *Barker v. Wingo*, 407 U.S. 514 (1972). And, in this court's view, the Nevada

14  Supreme Court's analysis and conclusion were objectively reasonable.

15      Stroup was charged with the murders of Dan Rasmussen and Jack Strawbridge

16  in a criminal complaint filed in Reno Justice Court on August 17, 1998.  (Exh. 2.)  When

17  the criminal complaint was filed, Stroup was in California awaiting trial on unrelated

18  attempted murder charges. (*See* Testimony of William L. Osterhoudt, Transcript of

19  Evidentiary Hearing, November 7, 2000, Exh. 149 at 5.)  In September 1998, the State

20  of Nevada initiated proceedings to extradite Stroup from California to Nevada. (*Id.* at 16-

21  18.) Stroup refused to waive extradition, and he was not transferred to Nevada custody

22  and brought to Nevada to face trial until October 1999, after the California charges were

23  dismissed following two mistrials. (*Id.* at 16-18, 22; *see also* Minutes of the Justice

24  Court, Exh. 18 at 1 (Stroup denied "O/R" in Reno Justice Court on October 15, 1999).)

25      On November 9, 1999, the State filed a second amended criminal complaint.

26  (*See* Second Amended Criminal Complaint, Exh. 20.) A preliminary hearing was held

27  between December 13 and 21, 1999. (*See* Transcripts of Preliminary Hearing, Exhs.

28  25-32.) The preliminary hearing was originally scheduled for November 29, 1999, but

was continued to December 13, 1999, to enable Stroup's counsel to prepare. (*See* Order Denying Motion to Continue, attached to Exh. 23.)  Stroup requested a further continuance of the preliminary hearing, and that request was denied. (*See id.*) Following the preliminary hearing, and post-hearing briefing by the parties, in an order filed February 28, 2000, the justice court bound Stroup over for trial. (*See* Order After Preliminary Hearing, Exh. 40.)

On March 7, 2000, the State filed an information charging Stroup with the murders of Rasmussen and Strawbridge. (*See* Information, Exh. 44.) Stroup was arraigned in the state district court on March 16, 2000. (*See* Transcript of Proceedings, Arraignment, March 16, 2000, Exh. 46.) Stroup pled not guilty, and he requested a trial date.  (*Id.* at 3.)  The trial was set for May 15, 2000.  (*Id.* at 4.)

During the last half of March 2000, Stroup filed some 21 pretrial motions. (*See* Exhs. 48, 50-69; *see also* Consolidated Opposition to Pre-Trial Motions, filed by the prosecution on April 5, 2000, Exh. 76.)  On April 5, 2000, Stroup filed a pretrial petition for writ of habeas corpus, asserting, among other arguments, that his right to a speedy trial had been violated. (*See* Petition for Pretrial Writ of Habeas Corpus, Exh. 74A; Points and Authorities in Support of Writ of Habeas Corpus, Exh. 74B at 13-22; *see also* Opposition to Petition for Writ of Habeas Corpus, filed by the prosecution on April 17, 2000, Exh. 83A.) The trial court held a hearing regarding the pretrial motions on April 13 and 14, 2000. (*See* Transcript of Proceedings, Pre-Trial Motions, April 13, 2000, Exhs. 81A, 81B, 81C, 81D, 83; *see also* Transcript of Proceedings, Hearing to Review Proposed Jury Questionnaires, April 18, 2000, Exhs. 88A, 88B.)  On April 20, 2000, the trial court issued an order ruling on most of Stroup's pretrial motions. (*See* Order, Exh. 92.) On April 24, 2000, Stroup filed a motion to disqualify the special prosecutor in the case, arguing that he had made himself a witness in opposing Stroup's argument, in his pretrial habeas petition, that his speedy trial rights were violated. (*See* Motion to Disqualify Special Prosecutor, Exh. 96.) On April 26, 2000, Stroup then filed a motion for independent DNA testing. (*See* Motion for Independent DNA Testing, Exh. 103.)  In

that motion, Stroup indicated that he would need at least eight to twelve weeks to complete the DNA testing.  (*Id.* at 4.)

On May 1, 2000, the state district court held a hearing to confirm the trial date, and to address Stroup's pretrial habeas petition, as well as his motions to disqualify the special prosecutor and for independent DNA testing. (Transcript of Proceedings, May 1, 2000, Exh. 105.)  During that hearing, Stroup requested that the trial be continued for two to four months so that he could conduct the DNA testing. (*Id.* at 9-10, 50; *see also* Exh. 109 (Stroup's formal, written motion to continue trial).) The prosecution vehemently opposed the request to continue the trial. (*See*, *e.g.*, *id.* at 15-16.) The state district court judge expressed extreme displeasure regarding the timing and circumstances of the request for a continuance. (*See id.* at 20-21, 46-47, 50-52; *see also* Transcript of Proceedings, May 8, 2000, Exh. 110 at 9.)

On May 5, 2000, the state district court heard argument on Stroup's motion to disqualify the special prosecutor, and denied the motion. (*See* Transcript of Proceedings, May 5, 2000, Exh. 108.)

On May 8, 2000, the state district court conferred at length with the parties, and set a new trial date of March 19, 2001. (*See* Transcript of Proceedings, May 8, 2000, Exh. 110.) The court stated that the March 19, 2001, trial date was the "earliest and best available date," given the defense's inability "to articulate when they [were] going to be ready and how much time [they would] need to review the evidence, and based upon the totality of all the parties' calendars…." (*Id.* at 20.)

On May 9, 2000, the state district court denied the defense's motion to disqualify the special prosecutor. (*See* Order Denying Motion to Disqualify Special Prosecutor, Exh. 111.)

On November 1 and 7, 2000, the state district court conducted an evidentiary hearing regarding the speedy trial claim in Stroup's pre-trial habeas petition. (*See* Transcript of Proceedings, November 1, 2000, Exhs. 144A, 144B; Transcript of ///

Proceedings, November 7, 2000, Exh. 149.) At the conclusion of the hearing, in an order filed on November 29, 2000, the court denied the claim.  (*See* Order, Exh. 154.)

Stroup's trial commenced on March 20, 2001, and concluded on April 3, 2001. (*See* Exhs. 216,  263.)

The first factor in the *Barker* analysis, the length of delay, is a threshold issue; unless the delay is great enough to be presumptively prejudicial, the court need not consider the remaining factors. *See United States v. Beamon*, 992 F.2d 1009, 1012 (9th Cir.1993). The delay in this case was approximately two years and seven months, from August 17, 1998, when the original criminal complaint was filed, to March 20, 2001, when Stroup's trial commenced. In this Court's view, this is enough delay to bring the other *Barker* factors into play. *See Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992) (delays approaching one year are presumptively prejudicial).

With respect to the second *Barker* factor, the reasons for the delay, the Court sees no indication in the record that any delay that can possibly be attributed to the prosecution was in bad faith, or was unnecessary. This was a serious and relatively complex criminal case, complicated by the fact that, when it was initiated, Stroup was in California facing trial on unrelated attempted murder charges. The delay from August 17, 1998, when the original criminal complaint was filed, until October 1999, when Stroup was brought to Nevada to face trial, was caused by the criminal charges brought against Stroup in California, Stroup's refusal to waive extradition to Nevada, and his request for time to challenge the extradition warrant. This portion of the delay cannot be attributed to the prosecution. After October 1999, the vast majority of the delay was caused by the defense's need for time for independent DNA testing, and for other trial preparation. Therefore, this factor, the cause of the delay, weighs heavily against Stroup.

The third *Barker* factor, the degree to which the defendant asserted his right to a speedy trial, also weighs against Stroup. Stroup did file a pre-trial habeas corpus petition making a speedy trial claim, focused on the delay before he was extradited to

11

1  Nevada to face trial. But that claim was meritless, in light of the circumstances regarding

2  that portion of the delay. Moreover, once in Nevada, it was Stroup himself who delayed

3  the trial. Most significantly, the delay of the trial from May 15, 2000, to March 19, 2001,

4  was upon a request for continuance made by Stroup, over vigorous objections by the

5  State.

6          The fourth *Barker* factor is prejudice to the defendant on account of the delay.

7  There is no showing that Stroup was prejudiced by the delay, most of which was at his

8  own request.

9          This Court concludes that the Nevada Supreme Court's ruling, denying Stroup

10 relief on his speedy trial claim, was not an unreasonable application of clearly

11 established federal law, as determined by the Supreme Court, and was not based on an

12 unreasonable determination of the facts in light of the evidence presented in state court.

13 *See* 28 U.S.C. § 2254(d). The Court will, therefore, deny Stroup habeas corpus relief.

14 **V.     CERTIFICATE OF APPEALABILITY**

15         The standard for the issuance of a certificate of appealability requires a

16 "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c). The

17 Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

18              Where a district court has rejected the constitutional claims on the
                merits, the showing required to satisfy § 2253(c) is straightforward: The
19              petitioner must demonstrate that reasonable jurists would find the district
                court's assessment of the constitutional claims debatable or wrong.

20 *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074,

21 1077-79 (9th Cir.2000).

22         Applying the standard articulated in *Slack*, the Court finds that a certificate of

23 appealability is not warranted.

24 **VI.    CONCLUSION**

25         It is therefore ordered that the Clerk of the Court shall update the docket in this

26 case to reflect that Adam Paul Laxalt is substituted for Catherine Cortez-Masto as the

27 respondent Attorney General of Nevada.

28 ///

1    It is further ordered that Bobby Jehu Stroup's petition for writ of habeas corpus

2  (dkt. no. 7) is denied.

3    It is further ordered that the petitioner, Bobby Jehu Stroup, is denied a certificate

4  of appealability.

5    It is further ordered that the Clerk of the Court shall enter judgment accordingly.

6

7    DATED THIS 1st day of April 2015.

8

9    _____
     MIRANDA M. DU
10   UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28